Good morning. I'm sitting in the law school and I looked at my calendar this morning and it's been 20 years since I was arguing a case in Judge Howard's courtroom that changed the trajectory of my life. So as I'm watching all these law students here, I couldn't help but feel a bit nostalgic. Back to this case, I think the most astonishing thing to me when I pick up the this case and the appeal is that the one thread throughout all of the 1983 mitigation and qualified immunity is that it generally, when you get to the circuit court level, is a robust discussion of the facts. And that's the analysis because of the de novo standard. And it's almost always, I can't find anything and I'm sure maybe you have, but I haven't found a 12 v 6 determination in a situation like this ever. And what you have here, I think clearly is, gives new meaning to rock it, dock it. If you have a situation like this, where you have what I consider to be at a complaint level, a pretty good description of an excessive force. You don't have a Graham type situation where there is somebody who's a fleeing felon or a fugitive or a crime is suspected or anything else. You have a very sad situation, a horrible situation, but one that unfortunately, at least in my experience, is all too often in these police shooting cases. The police shooting cases, it seems to be always involving somebody with mental health challenges. And so that's what you have here. You don't have somebody who just robbed a liquor store. You don't have somebody who's sitting in a car or you're executing an arrest warrant or there's a suspicion of anything else. All you have here is a kid who's in high school who's distraught and his mother called for help by much to her lasting regret. And then unfortunately, I think there was, on a factual basis, an officer who got a little over his skis and the dog chase and somewhere a distraught teenager turned into, at least in an officer's mind, somebody who was a fleeing felon, which was not the case. And the part that is just inexplicable to me, and I don't mean to make a light of it because it's wrongful death and it's a tragedy, but I've used for 20 years the old expression, when somebody makes an idiotic argument, making the gesture of myself putting a gun to my head and saying, stop or I'll shoot. Well, that's, you know, this is the next level of absurdity. He has the gun to his head. The officer says, drop the gun. And then he says that order two or three times. And as he starts to, I mean, the best case scenario for them is the harm was to himself. There's nothing in the pleadings, nothing anywhere. In fact, I would submit to you that if we got to the point where we were able to develop discovery, that we would show you that it was quite the opposite, that there was no fear. In fact, it's not in the record, but I will tell you based on FOIA discovery and things of that nature, the officer never, ever said that he was in fear. The only person who had a threat to their safety was the deceased. He's the one. He's the one who's dead. And somehow that has been transmuted both by the law enforcement and at the district court level into a fact that this poor young man's distraught nature and self was transmuted into a threat to the officer. That can't be the law. And it certainly can't be the law that you can file a complaint that details facts and circumstances that on their face, I think arguably would survive summary judgment. But put that all aside, we're at a 12B6 level. How do you get to a situation where a district court judge says, not only am I going to decide it, I'm going to take the facts not only like best to the plaintiff, I'm going to turn the law on its head, and now I'm no longer going to engage in any kind of robust discussion? There could be a case where the law is not clearly established. And you've pled great facts, and you've done a great job, not you personally, but an attorney has done, pled great facts, but the law is just not clearly established. So what is your closest case, particularly an Eighth Circuit case? You had a closest Eighth Circuit case that looks like this one that says the law is clearly established. In terms of excessive use, I think the issue you've got here is that you can't, they can't ever say that there is any case where it's clearly established. And they simply use the Ludwig case. That puts the burdens on you, counsel, to show that the law was clearly established. There are two steps to the inquiry. First, there's a violation. Second, the law was clearly established so that a reasonable officer would know what the law was, right? Well, except the reasonable officer in this case, there was no threat. There is no threat. There's no threat to an officer. I'm asking for a case. Well, the two Eighth Circuit cases, the Ludwig and the, I want to say the other, the companion case that I mentioned. Ludwig and, I looked it up, but I couldn't pronounce it, I apologize for that. But the fact remains that both of those arguments, I believe, are a question post-factual discovery. We don't get to that analysis until we have a discovery. Well, but I don't mean to argue with you, say to argue with you that qualified immunity means immunity from suit. You know what the Supreme Court says. It means immunity from suit. Correct. Not just immunity from damages, not just immunity from summary judgment. It means immunity from getting served, almost. I wouldn't go that far. That's what the Supreme Court says. Well, I think the Supreme Court properly read says that qualified immunity comes, I don't think that there's anything that we can point to that says 12B6 is the proper vehicle to analyze whether or not qualified immunity applies. I don't think it says... Suppose there was an Eighth Circuit case that said, right on point with this, you wouldn't like it, I get it. Right. But right on point with this that said the law is not clearly established in the Eighth Circuit on this. And that would be subject to the first motion to dismiss possible. Well, but what would be the law? I mean, that's what I'm saying. What would be clearly established? Because the reason I'm hesitating here, and I don't want to go down this road, because I don't think that's what the law is. I think the law is, if it's clearly established, it's still predicated on a robust factual analysis. I keep coming back to that. You can't say what the clear law or the lineage is until you've developed the facts. So that analysis really kind of turns this to similarly to what the district court did on its head. Until we develop the facts. Well, we've got two or three arc of the gun cases. You know about them? Yes. Dooley and Partlow. Yes. One's a shotgun. Partlow and... One's a handgun, apparently. Right. What do those tell you?  Dooley and Partlow, Aikensback, Hernandez. Right. And I think a couple of those had Graham-type situations where the U.S. Supreme Court has said that's a different analysis if it's Graham and there's somebody who is a, they're suspected of a crime. If you don't have suspected of a crime, I don't think you get done that. And that is not... And frankly, I think also the U.S. Supreme Court has said that there is a, that you don't have to have something that's on all thurs or fives as we used to say. That you have to take it on a case by case basis. Let me ask you about the law. As I read your... You just said under a FOIA request, you thought you could develop a record that the officer was not in fear. Correct. If that's the case, then why didn't you, why didn't you allege malicious use of the gun? I mean, the way I read your complaint, you read, it almost reads like maybe he was wrong, but it was an honest mistake. He thought that when he was pulling the gun away from his head, he was meant to point it at the officer and therefore it was an honest mistake. If in fact he had no fear and that wasn't any, was not part of his subjective analysis, why didn't you allege a malicious shooting? Because the nothing... Once again, we come back to this conundrum. The fact is until I can get the information, I'm not of the mind to walk myself into rule 11 sanctions by the pleadings. So rather than, rather than just allege something for the sake of surviving, what I consider to be an ill-advised 12B6, obviously it was not so ill-advised, but rather than just do that, and I, you know, as I sometimes tell clients when they ask me, what's the result of this case? I said, if I had a crystal ball, I'd be at the track. I wouldn't be here. So the fact remains that now I could, if I had fact discovery, I could. And mind you, everything that we've got is developed from, and we did do a, what I thought was a pretty substantial recitation of what this investigation was. I, you know, the, the idea that somehow they came out and the police chief started a campaign where he started talking about this kid as a suspect, and where they started, they ran into juvenile court and they wanted to unseal his records, and they, they wanted to claim that there was something ill-advised about what the mother had done, and all this disinformation campaign, and then they wait 10 days before they do a nine-minute taped interview with the officer, with his lawyer. To my mind, we gave a lot of detail based in a situation where we were constrained. That's the reason I think that you would be hard-pressed to find any case whatsoever in a 1983 setting, not just in this circuit, but in any circuit that has been, that has said, okay, we've got a one-hand this idea in 1983 that you have to have this vigorous analysis and factual, and the standard is obviously that you've got to do it de novo, and then on the other hand, we're going to say, we're going to take your pleadings and say no. Mind you, what the district court had to do, and what the defendants had to do at the trial court level, is they had to ask him to say, ask his honor to say, that the dropping of the gun was fear. They got, they got a factual determination where the standard says you do not get that. What do you think the law is? Let's assume the officer subjectively believed that by pulling the gun away from his head he was meant to do harm to the officer, but objectively he was wrong. How does that fit into the 1983 standard? So under your hypothetical, the officer, we would survive a motion for summary judgment, and that would be a jury determination. Even if the officer subjectively believed that he was being threatened by pulling the gun away from the head? If the officer subjectively believed that, but objectively was wrong, I think the state of the law is the officer loses. I don't think, I will tell you that I resist that characterization, and mind you, my discovery and factual ability to suss out the facts is limited, but I think that's the state of the law. I keep looking over here because I've got two minutes left, and I do not want to be left without. We can start now because it's 2.16, 2.17? Right, if I can reserve it. Thank you. Thank you. Ms. Adams. Good morning, your honors. May it please the court, my name is Jenna Adams, and I represent the city of Benton, Arkansas, Kyle Ellison, and Kirk Lane in this lawsuit. I'm going to start by addressing your question, or actually tell you, Judge Benton, that you hit the nail on the head here. There absolutely is, the law is not clearly established in this case. No, wait, it's clearly established if it's an arc. I'm sorry? If the gun is going in an arc motion, the police officer can use deadly force. We've got four or five cases on that. Well, all that was implied in the complaint was that he moved the gun away from his head. We don't know how he was moving the gun away from his head, and I don't think that that matters, because we have a previous noncompliance. When Officer Ellison saw him with the gun by his side, he told him to drop the gun. He did nothing, and he raised the gun to his head. That simply is noncompliance, and case law is absolutely clear. He was told then to drop the gun, and their argument is, how do you drop the gun if you don't pull it away from your head? That's what's alleged, is he was complying with the police officers? That's at the second moment. The first moment, the first time he tells him to drop the gun, the gun's still at his side. Not at his head, counsel. No, the first time he tells him to drop the gun, in paragraph 19 of his complaint, the gun is at his side. He tells him to drop the gun. He says nothing, and he raises it to his head. That is not complying with the officer's command to drop the gun. Does that give him the right to shoot him then? According to case law, yes, it does. Roger's case? Our Roger's case, counsel? Is Roger's the closest case? I don't think that there's an Eighth Circuit case directly on point. Well, how close is Roger's versus King? I'm sorry, your honor. In my 2018 case, it sounds like it's going to be pointed at somebody. The gun's got to be pointed at the officer, or about to be pointed. That's the ARC stuff. Well, so if you're talking about the moment that he has the gun at his head, and he's bringing it down, a reasonable officer would not be whether he was going to comply with the command. Roger's the suicidal woman, refuses commands to drop. See, that's how it's like this case. And then she raises the gun to the officer's shin level. And that's okay, because it's pointed at the officer's shin. That the force was reasonable? Right. Okay. Okay. Now, in this case, if you read 19 and 20, I think you're on the right paragraphs, we don't have anything like that. But we still have, he didn't comply with the officer's command. An Eighth Circuit case law... But the allegation is he did comply with the command. It's saying he didn't comply with the initial command, but once it was at his head, he complied by pointing it away. So your argument is that even if he had dropped it on the ground, at that point, he could be shot? Once it's at his head, if he were to drop it on the ground, then maybe we'd have a different scenario. Well, that's their argument, though, is he was in the process of dropping it to the ground. Well, it doesn't say that he's going to drop it. It says he moves it away. Let me talk real quick about a case that's almost directly on point. Okay, what do you think it is? Go ahead, tell us. Garzinski v. Bradshaw of the Eleventh Circuit. In that case... Oh, you're out of circuit, counsel. Now, that's what I was on your opponent for. He's got Ninth Circuit cases out the wazoo in his briefcase. This is actually my... And as you can tell, that bugged me a lot. This is a point that I will make, you know, it's not clearly established. There's no Eighth Circuit law. Could you really give us an Eighth Circuit case? First, we got four. Okay, you know, we got Partlow v. Stadler of the Eighth Circuit. That's a suicidal suspect. Yes. There... In the shotgun, they believe they were aiming the barrel of the shotgun at the officers, says this court. But the court said that even if he intended to do no harm to the officers as he moved the shotgun, the officers' use of force was objectively reasonable because they had no way of knowing what he planned to do. And this goes to your question that you were asking him, Judge Malloy. It says aiming, though, counsel. The case says aiming. You know what I'm referring to? I'm quoting it. Well, there was a disputed fact as to whether or not they pointed it at the officers or not in that case. But to answer your question, Judge Malloy, you had said that you were asking about a mistaken belief, and that actually is cited in Partlow, that any mistaken belief that he was aiming it at the officers made the use of force objectively reasonable in light of the circumstances. But all of those cases, and this goes back to one of Mr. Geragos' arguments, is all these cases come to us on a summary judgment record where we don't have anything in this record that tells us what the officer was thinking. We could, for all we know, we could assume the officer knew he was dropping the gun. We don't know that. So how do we know what the officer was thinking? We don't in this case, do we? Well, I think the standard is what a reasonable officer could conclude. And I think the case law is clear that a reasonable officer in this scenario could conclude that it's absolutely, it's impossible to determine whether he was lowering the gun in order to comply with the officer's commands or if he was going to aim it at the officer. And so, as I was saying with Garczynski, which is an 11th Circuit case, I get, but it is factually similar to this case. We had a 9-1-1 was called on a suicidal man who had a gun. Would you tell me the whole name of the case? Garczynski v. Bradshaw. It's an 11th Circuit case. Officers see the man raise the gun to his head and they order him to drop the gun. He did not comply with the officer's numerous commands. And at one point, he did actually point the officers in the, or the gun in the direction of the officers. However, the court specifically stated that even if a man did, if the man did not point the gun in the officer's direction, the fact that he did not comply with the officer's repeated commands to drop the gun justified the use of deadly force. We have that here. Keegan was told initially, when he had the gun at his side, to drop the gun. He didn't do that. Instead, he said nothing and he raised it to his head. That is the definition of non-compliance. Then at that moment, when he's told several more times. Counsel, are you really arguing that if you take the gun and you point it at yourself, like put it in your mouth, that that's just a thing the officer's shooting right then? Is that what you're arguing? That's, that's how these, these courts have held. And I mean, there's not an 8th Circuit case directly on point, which as you know, you weren't getting at with opposing counsel, is that there's, there's no case law in the 8th Circuit or Supreme Court that is directly on point. While this court ruled on the first song. Also say though that if non-compliance, even if you do it, even if you don't comply with the first command, as long as you comply with the second command, you can't shoot them. I'm sorry, can you say that again? In this case, the allegation in the, you got to take the complaint. The allegation in the complaint is, he's got the gun by his side. Officer says, drop the gun. He points it to his head. Everybody agrees that's, argument will say, that's not compliance. But then he says, drop the gun. Now if he complies, if he complies at that point, you can't shoot him, can you? But how is an officer supposed to know his actual intentions? The 8th Circuit in Hernandez specifically said, an actual intent, whether or not he was compliant or not, can't be distinguished. A reasonable officer could conclude that he, may have been, he was going to point it at the officers. We don't know. Same thing in Partlow. They said, it was impossible to tell what his intentions were. Hernandez, the officer had previously rammed another car, and then was going to ram the other officer's car. We don't have a case here where you pointed, somebody then pointed at him. Not out of the 8th Circuit, no we don't. But counsel, what is the, what's the second disobedience that you refer to? The second act of disobedience. Well, I was, I was really trying to point out that, the first one is what justified the use of force. When he didn't comply, the first, telling him to drop the gun, instead of raising it to his head, that's what justified the use of force. The second. One minute. Now let me make sure. You, you think that, use of force was justified then? Yes. Because he pointed the gun at his own head? He didn't, the officer told him to drop the gun and he didn't. That is not complying with the officers. What if he said, he escalated the situation. What if he put the gun in his waistband of his trousers? He disobeyed the officer, could they shoot him? Well, we can, we can hypothetically say, I mean, that's a different situation. I mean, he didn't comply, but officers may at that point, be able to do something different. I thought, I thought your argument was not, wasn't, wasn't premised on disobedience. I thought it was premised on an action by this young man that a reasonable officer could, could believe, could him and other officers in danger. Absolutely. I mean. What was that? What was that action? Well, the moment he moved it away from his head, a reasonable officer would not be able to determine what his intentions were. He couldn't. Now do we know from the complaint, that's all we have at this point, what that motion was? Which direction was the motion? We don't. We don't. Was it, was it behind him? I don't think it matters. I think. It surely matters. It surely matters, he pointed it the other way. No matter what way he would have moved it, the officer still would not be, in a split second, we're talking about rapidly evolving, you know, scenario here. An officer in a split second, could possibly make a determination. This is all we know from the complaint. Remember, all we got is a complaint. Sure. Usually we got all kinds of stuff. Here we don't. Sorry, I made a step on you. But, but the quick is all we know. Quick to some people, from near and dear, I won't make any jokes about how long quick is, but, but quick to some people is a long time, some people it's a short time. And they get the benefit of any intent at this point of the game. Well, if the motion, if the motion away from his head is, is in the direction of the officer, no matter how slight, I can see that as, as arguable. But if the motion is in another direction, I'm not sure you give law enforcement officers enough credit to, to, to believe that a, that a reasonable officer would be justified in opening fire in a situation where a person is pointing a gun in a different direction. I think, and that's, we don't know. From the complaint, it's all it says. He began to move the gun away from his head. We don't know what direction, what he did. And I would argue it doesn't matter. Thompson versus Hubbard out of the Eighth Circuit says that we don't have to wait and see what his actual and what his intentions were before we're allowed to use excessive force here, especially when he has not complied previously. Okay, how about if he just doesn't move the gun at all and he, it's pointed at his head and he disobeys the order to drop the gun, he continues to point it at his head, so can the officer open fire? Yeah, that's, that's repeated refusal to comply. Yes, I would say so. What do we make of the numerous allegations in the complaint that you try to then did an essence of sham investigation? I'm sorry, say, can you repeat that again? Essentially, you did a sham investigation. You didn't interview the officer for 10 days. You do everything you could to make the decedent and his mother look bad. You called him a criminal. You called him a juvenile, a suspect in a crime, which I don't think he was. What, does that have any relevance? I assume you don't think that has any relevance, but does that show a consciousness of guilt? That's what we, that's how we usually get to that issue. For purposes of a motion to dismiss, no. As far as the official capacity, it would go to the official capacity claims, I would think. But the district court found that the, there was no underlying constitutional violation, so that's how they dismissed the official capacity claims. At the motion to dismiss stage, no. Here, we're looking at qualified immunity. And another question that you had asked regarding qualified, I'm sorry, it might have been you, Judge Benton, regarding qualified immunity. And it, normally, you know, he brought up that all of these cases that we cite to it at the summary judgment stage. However, the Supreme Court has made it absolutely clear that qualified immunity must be decided at the earliest possible stage. It is immunity from suit, like you stated. And so, it's extremely important that, you know, it's decided here for Keegan. The country officially allows they get every inference at this stage, right from the complaint, every favorable inference. And I would argue that the district court did not make any improper inferences, as appellants suggest. They say that they made an improper inference by saying that Keegan refused to comply with commands, which we all, it seems to me like we have agreed that the initial moving the gun from, when he was ordered to drop the gun and moving it to his head, that that was noncompliance. So, the district court did not make an improper inference there. This, the Eighth Circuit has specifically stated, and appellants actually cite it in the reply brief, U.S. versus any and all radio, that the district court is required to accept as true all facts pled by appellants and grant all reasonable inferences from the pleadings in appellant's favor. The Eighth Circuit also said in Brown versus Medtronic that while they must draw reasonable inferences in the plaintiff's favor, it need not make unreasonable inferences or accept unrealistic assertions. It would simply be unreasonable to determine that he was being compliant at that point. He didn't drop the gun when he was told it and so he raised it to his head. They also argue that the facts as pled give rise to the inference that Ellison's shooting of Keegan constituted excessive force. That's a legal conclusion and the district court simply refused to, rejected that legal conclusion and instead found that the force was justified and that a reasonable officer could conclude that Keegan posed a threat. We talked a lot about the second prong and this court certainly can decide this or affirm this based on the second prong even though the district court decided it on the first prong. But opposing counsel talked about the gram factors and I think it's absolutely clear here that he did not pose a, or that he did pose a threat to the officers. Your time has expired. It has expired. Thank you so much. Jurgis, we're back to you. In answer to your question, Your Honor, there's an old adage and I wish I could remember where it came from that the guilty flee where no man pursueth. That is what the answer to your question about the shame investigation is. It was obvious and I give kudos to opposing counsel for what I consider to be a Herculean effort to save this. But the fact remains that their position now is exactly what I stated to you before jokingly in that they think he was non-compliant because he put the gun to his head and at that point they're wedded to this position as absurd as it is that as soon as he tried to commit suicide, we're going to solve that problem for you. We're going to commit a homicide. So that is what they're arguing. They're asking. Counsel, under our established law, if the arc of the gun was toward the officer from the head, the officer in the 8th circuit can use reasonable force. Correct. And I think... And legal force, deadly force. You cited the case which I think probably controls which is the shotgun pointed. I think it was a shotgun. I don't think it was a handgun. One case was a shotgun, one was a handgun. Right. And so we don't have that here. We have by all accounts exactly at a complaint stage a rather astonishing position that is put out here by the municipality is that basically if you're trying to... If you try to commit suicide, that's non-compliance with my order and therefore I get to commit a homicide. I've never... 36 years I've been doing this. I've never understood that a suicide gives you the predicate for a homicide. So I will submit to you, and I don't mean this facetiously, that if it was not an officer, this would be a criminal case. I don't think that there is any justification in a criminal context for somebody to say, I thought they were going to kill themselves so I shot them dead. I mean, I'd be laughed out of any courtroom in America if I made that argument. I know I've got 16 seconds left. I appreciate it and thank you very much. Thank you, counsel. Case number 18-1803 is submitted for decision by the court. Ms. Gants. Mr. Rowe, when you're ready.